IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02750-MEH

BELMA JAZVIN,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Belma Jazvin appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal. After consideration of the parties' briefs and the administrative record, the Court affirms the ALJ's decision.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for

DIB and SSI benefits filed on May 18, 2012.  [Administrative Record ("AR") 156-166]  After the applications were initially denied on August 20, 2012 [AR 83-86], an Administrative Law Judge ("ALJ") scheduled a hearing upon the Plaintiff's request for August 22, 2013 [AR 125-129].  At the hearing, the Plaintiff, her friends, and a vocational expert testified.  [AR 33-63]  The ALJ issued a written ruling on August 27, 2013 finding Plaintiff was not disabled starting on February 7, 2012 because Plaintiff could perform her past work considering her age, education, work experience and residual functional capacity.  [AR 17-28]  The SSA Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's determination on August 4, 2014, making the SSA Commissioner's denial final for the purpose of judicial review [AR 3-6].  *See* 20 C.F.R. § 416.1481. Plaintiff timely filed her complaint with this Court seeking review of the Commissioner's final decision.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on March 9, 1966; she was 46 years old when she filed her applications for DIB and SSI on May 18, 2012.  [AR 156]  Plaintiff claims she became disabled on February 7, 2012 [*id.*] and reported that she was limited in her ability to work due to schizophrenia, complications from medications, dizziness, shakes, and vision issues.  [AR 195]  Plaintiff's friend (due to language barriers) completed a "Function Report" in tandem with Plaintiff's application, in which she described Plaintiff as having symptoms of hearing voices intermittently, disorganized thought processes, and side effects from medication including dizziness, shaking, tingling, and vision impairment (her right eye "rolling back in her head").  [AR 212]  Plaintiff asserts she came to the United States in 1995 as a refugee from the Bosnian war, during which time she lived in

refugee camps and lost her mother; she believes this history is a major cause of her declining mental health, which in turn, contributes to a decline in her physical health.  [AR 219]

The record indicates that in July 2002, Plaintiff was admitted to the Denver Health Medical Center Psychiatric Emergency Room for short-term treatment after taking an overdose of Zyprexa; Plaintiff reported that "voices from the roof" told her "bad things" (such as that they killed her mother and grandmother) when she was alone. [AR 249] The reporting physicians concluded that Plaintiff "suffer[ed] from a mental illness that [ ] caused her to be a danger to herself and gravely disabled." [*Id.*]

The next record is dated September 13, 2010 from the University of Colorado ("CU") Hospital which reflects it was the Plaintiff's "first followup visit since transfer to new resident." [AR 260] Plaintiff reported to Kurt Humphrey, M.D. that she was doing well overall and her only concern was running out of her "psych" medication, Geoden, because without it, she may have a return of psychotic symptoms. [*Id.*] The next record from May 25, 2011 reflects Plaintiff's report to Dr. Humphrey that Geoden still worked well for her, but she was under additional stress since losing her job the previous week. [AR 255] Dr. Humphrey reported that Plaintiff was "fairly high functioning on her medications." [*Id.*]

Plaintiff presented to CU Hospital on September 19, 2011 for a follow-up appointment with Sarah Kuykendall , M.D. and reported she was "doing very well" on her medications with no side effects; she experienced "only occasional" auditory hallucinations with stress. [AR 252]  Plaintiff was still unemployed and enjoyed relaxing and "time for herself," but was "eager to find employment again." [*Id.*] Dr. Kuykendall diagnosed Plaintiff with paranoid schizophrenia and

3

assessed a Global Assessment of Functioning (GAF) score of 70.[1] [AR 253] A subsequent record

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR

from December 8, 2011 reflects a similar report from Dr. Kuykendall that Plaintiff was "very high functioning" and "remains stable psychiatrically," but the doctor adjusted her GAF score to 61-70. [AR 263-265]  Dr. Kuykendall made the same findings on February 7, 2012 (Plaintiff's stated disability onset date), including that Plaintiff's symptoms were "well controlled," but noted a "head tilt" and symptoms of "torticollis,"[2] so diagnosed Plaintiff with extrapyramidal symptoms[3] and started her on a new medication. [AR 265-267]

On May 14, 2012, Dr. Kuykendall made the same findings as above, but noted Plaintiff's complaints of diplopia,[4] torticollis, and dystonia[5] symptoms, which Plaintiff reported as having "for over 3 years." [AR 268-269] Plaintiff also sought the doctor's help in applying for disability benefits, as her unemployment benefits were soon ending. [*Id.*] The following month, Plaintiff

---

persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

[2]Torticollis "is a dystonic condition defined by an abnormal, asymmetrical head or neck position."  Torticollis, Wikipedia (available at http://en.wikipedia.org/wiki/torticollis) (last accessed October 27, 2015).

[3]Extrapyramidal symptoms "are drug induced movement disorders" that may be caused by antipsychotic medications and include, *inter alia*, dystonia.  Extrapyramidal Symptoms, Wikipedia (available at http://en.wikipedia.org/wiki/extrapyramidal_symptoms) (last accessed October 27, 2015).

[4]Diplopia or "double vision" is "usually the result of impaired function of the extraocular muscles (EOMs), where both eyes are still functional but they cannot converge to target the desired object."  Diplopia, Wikipedia (available at http://en.wikipedia.org/wiki/diplopia) (last accessed October 27, 2015).

[5]"Dystonia is a neurological movement disorder in which sustained muscle contractions cause twisting and repetitive movements or abnormal postures."  Dystonia, Wikipedia (available at http://en.wikipedia.org/wiki/dystonia) (last accessed October 27, 2015).

reported to Dr. Kuykendall that her dystonia symptoms were improved with medication management; notably, the doctor repeated the same findings as in previous reports regarding Plaintiff's mental health. [AR 272-274]

Plaintiff presented to a new doctor at CU Hospital, Jeanne Theobald, M.D., on September 10, 2012, and complained of worsening dystonia symptoms, including her eyes rolling back in her head and trouble walking. [AR 303] Dr. Theobald found Plaintiff had been stable on psychotic medications for 10 years, observed no dystonic movements during the appointment, and diagnosed Plaintiff with chronic paranoid schizophrenia and extrapyramidal symptoms, and assessed a GAF score of 41-50. [AR 303-304] At the same time, Dr. Theobald and Brian Rothberg, M.D. completed a Med-9 form for the Plaintiff in which they asserted Plaintiff "has, at times, marked hallucinations as well as delusional and disorganized thoughts that make it difficult to communicate with her. She is also having significant problems w/ dystonias from the anti-psychotic medications which often leave her physically disabled." [AR 293]

At a visit with Dr. Theobald on November 19, 2012, Plaintiff reported "things are going much better with the new [psychotic] medicine"; in addition, although she still had problems with her eye and a stiff neck, she experienced no "problems using her legs." [AR 276] However, Plaintiff reported to the doctor on January 4, 2013 that her dystonias were happening "daily" and were "severe"; the doctor also noted "some concerns that she isn't taking [her medication] correctly." [AR 279-280] The following month, Plaintiff reported she was hearing voices "less frequently" and, while still having dystonias in her eye and neck, she had no further problems with her legs "cramping up." [AR 283-284] Then, in March 2013, Plaintiff reported she was "doing well overall,"

6

her psychotic symptoms were "well controlled with occasional paranoid thought," but there was no change in her dystonias. [AR 287-288]  In this last medical record, Dr. Theobald assessed the same diagnoses (chronic paranoid schizophrenia and extrapyramidal symptom) and GAF score (41-50).

### III. Hearing Testimony

On August 22, 2013, Plaintiff, her friends, Gail and Michael Weiss, and a vocational expert, William Tysdale, testified at the hearing.  [AR 34-64]  Plaintiff testified that she had a "very hard time" while working full-time and dealing with people; she and her doctor made a decision in February 2012 that she could no longer work; physically, she was able to work but her medication made her dizzy and she may fall down; other side effects of her medication was a stiff neck and her eye rolling up; she heard voices both at night and in the morning; a doctor whose name she could not recall told her she was not able to work because her mental illness was "very heavy"; she was able financially to get the medication she was currently taking; she was told she had a stroke, saw a neurologist "a couple of times" but could not follow up because she did not have insurance; and, she could no longer drive anywhere other than close to her home because of her eye impairment (seeing double).  [AR 37-49]

Plaintiff's friends testified that Plaintiff received mental health treatment at CU Hospital for free due to a program developed specifically for war refugees; Plaintiff's eye and neck conditions have gotten worse over the years, but she could not afford medical tests; she was recently approved for AND, and was on the waiting list for a physical examination; although Plaintiff tried to find work between her last job and February 2012, she had no offers or interviews; working at the convenience store during the night shift was "very stressful" for Plaintiff; and the doctor was unsure

whether Plaintiff's dystonias were caused by medication or a physical problem.    [AR 49-56]

The ALJ then turned to the vocational expert, Mr. Tysdale, who testified that an individual with Plaintiff's age, experience and education – and the ability to do a full range of work but not required to lift and carry more than 20 pounds occasionally and 10 pounds frequently; not required to climb scaffolds, ladders, and ropes, or balance; not required to work at unguarded heights and near unguarded hazardous mechanical equipment; not required to understand, remember, and carry out more than simple instructions; not required to have more than superficial interaction with the public ("superficial meaning that kind of contact and interaction verbally that doesn't involve anything of a detailed nature or problem-solving or anything of that sort, nothing that, you know, would amount to stress because of the content of the discussion") – could perform the Plaintiff's past job as an assembler, as well as the jobs of "inserting machine operator" and "cleaner/housekeeper." [AR 60-62]

The ALJ issued an unfavorable decision on August 27, 2013.  [AR 17-28]

## LEGAL STANDARDS

To qualify for benefits under sections 216(I) and 223 of the SSA, an individual must meet the insured status requirements of these sections, be under age 65, file an application for DIB and/or SSI for a period of disability, and be "disabled" as defined by the SSA.  42 U.S.C. §§ 416(I), 423, 1382. Additionally, SSI requires that an individual meet income, resource, and other relevant requirements.  *See* 42 U.S.C. § 1382.

## I.     SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation

8

process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.  If she is, disability benefits are denied.  *See* 20 C.F.R. §§ 404.1520, 416.920.  Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is unable to show that her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits.  *See* 20 C.F.R. 404.1520(c).  Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, she is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work that she has performed in the past.  If the claimant is able to perform her previous work, the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work

in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.      Standard of Review

This Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied.  *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).  "Substantial evidence is more than a scintilla, but less than a preponderance; it is such evidence that a reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).  However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the onset date of her disability, February 7, 2012 (Step One).  [AR 19]  Further, the ALJ determined that

Plaintiff had the following severe impairments: diplopia of the right eye, dizziness, and schizophrenia (Step Two).  [*Id.*]  Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 20]

The ALJ then determined that Plaintiff had the RFC to perform "light work as defined by 20 C.F.R. 404.1567(b) and 416.967(b)," except she is "not required to lift and carry more than 20 pounds occasionally and 10 pounds frequently. She is not required to climb scaffolds, ladders, and ropes, or balance.  She is not required to work at unguarded heights or near unguarded hazardous mechanical equipment. She is not required to see out of more than one eye. She is not required to understand, remember, and carry out more than simple instructions.  She is not required to have more than superficial interaction with the public." [AR 21]  The ALJ determined the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  [AR 22]

The ALJ proceeded to determine the Plaintiff was capable of performing past relevant work as an assembler (Step Four).  [AR 26] Alternatively, the ALJ found that Plaintiff could perform other jobs existing in the national economy, including a machine operator and a cleaner of houses. [AR 27] As a result, the ALJ concluded that Plaintiff was not disabled at Step Four and, alternatively, at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [*Id.*]

Plaintiff sought review of the ALJ's decision by the Appeals Council on October 24, 2013.

[AR 7]  On August 4, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security."  [AR 3-5]  Plaintiff timely filed her Complaint in this matter on October 8, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ erred by failing to develop the record regarding the functional effects of Plaintiff's mental and physical impairments; (2) the ALJ failed to find Plaintiff's dystonia, torticollis, sialorrhea, oculogyrate crises, and extrapyramidal symptoms were severe impairments or, alternatively, failed to explain why there were not severe; (3) the ALJ failed to include restrictions in the RFC for Plaintiff's dystonia, torticollis, oculogyrate crises, and extrapyramidal symptoms; and (4) the ALJ's adverse credibility finding is illogical, based on irrelevant factors, and is not supported by substantial evidence.

## ANALYSIS

The Court will address each of the Plaintiff's issues in turn.

## I.      ALJ's Duty to Develop the Record

Plaintiff argues that the ALJ failed to make inquiries of the Plaintiff at the hearing regarding the effects of her mental or physical conditions on her daily routines and her ability to work, and failed to order a consultative examination of Plaintiff's physical functional ability to work.  She contends that the record contains no opinions from medical providers regarding the effects of her mental and physical impairments on her ability to perform work.

"In a social security disability case, the claimant bears the burden to prove her disability."

*Wall v. Astrue*, 561 F.3d 1048, 1062 (10th Cir. 2009) (quoting *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007)).  But because "administrative disability hearings are nonadversarial . . . the ALJ has a duty to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Id.* at 1062-63.  The ALJ's "duty is one of inquiry, ensuring that the ALJ is informed about facts relevant to his decision and learns the claimant's own version of those facts." *Cowan v. Astrue*, 552 F.3d 1182, 1187 (10th Cir. 2008) (quoting *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993)).  "'The standard for determining whether the ALJ fully developed the record 'is one of reasonable good judgment." *Segura v. Barnhart*, 148 F. App'x 707, 710 (10th Cir. 2005) (quoting *Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997)).  If there is sufficient information to make a disability determination, the record is sufficiently developed.  *Cowan*, 552 F.3d at 1187; 20 C.F.R. § 404.1520b.

If a party does not identify the specific evidence the ALJ should have developed, such omission ends the party's duty-to-develop argument.  *See Watson v. Barnhart*, 194 F. App'x 526, 530 (10th Cir. 2006) ("Watson neither (1) suggests what the omitted treatment evidence might reveal; nor (2) identifies anything in the record that would have reasonably notified the ALJ that such evidence existed."); *Jaramillo v. Massanari*, 21 F. App'x 792, 795 (10th Cir. 2001) ("She has not identified medical providers from whom records were missing nor did she ask assistance in obtaining any records. On appeal, she has failed to identify the evidence she claims the ALJ should have obtained. The ALJ did not violate the duty to develop the record.").

"Further, the ALJ's duty pertains even if the claimant is represented by counsel." *Wall*, 561 F.3d at 1063.  But, "when the claimant is represented by counsel at the administrative hearing, the

ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." *Cowan*, 552 F.3d at 1188 (internal quotation marks and citation omitted). "[I]n a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development." *Id.*

Here, the Plaintiff contends that the need for a consultative examination of the Plaintiff's physical ability to work was clearly established by the record. The Court disagrees. The Tenth Circuit recently identified the ALJ's responsibilities in determining whether to order a consultative examination: "where there is a direct conflict in the medical evidence"; "where the medical evidence in the record is inconclusive"; and "where additional tests are required to explain a diagnosis already contained in the record." *Duncan v. Colvin*, 608 F. App'x 566, 570 (10th Cir. 2015) (citing *Hawkins*, 113 F.3d at 1166 and 20 C.F.R. § 404.1519a(b)).

Plaintiff cites to none of these situations; rather, Plaintiff argues that, because the record contains no opinion by a consultative examiner concerning Plaintiff's ability to work in light of her mental and physical impairments, the ALJ was required to order one. But, unlike in *Duncan*, Plaintiff's counsel here did not raise an issue at the hearing of any lack of medical evidence nor did he request a consultative examination. In fact, the ALJ specifically asked Plaintiff's counsel if there was anything else to address before the record was closed and counsel answered, "Not at this time, no." [AR 63] *See Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (the duty to develop a record "does not permit a claimant, through counsel, to rest on the record ... and later fault the ALJ for not performing a more exhaustive investigation.").

In addition, the Court is not persuaded that the ALJ failed to ask sufficient questions of the

14

Plaintiff at the hearing.  The case Plaintiff cites for her proposition sets forth the responsibilities of

an ALJ seeking information from a claimant who is *not* represented by counsel (*see Musgrave v.

Sullivan*, 966 F.2d 1371, 1374-75 (10th Cir. 1992)); here, of course, the Plaintiff was represented

by counsel at the hearing and, thus, had sufficient opportunity to provide information regarding "the

effects of her mental or physical conditions on her daily routine and activities, and on her ability to

work."  Opening Brief, docket #15 at 18; *see also* AR 45-48.

The Court finds the ALJ had no duty to further develop the record in this case.

## II.     ALJ's Duty at Steps Two and Three

Plaintiff asserts that the ALJ erred by not finding her conditions of dystonia, torticollis,

sialorrhea, "oculogyrate crises,"[6] and extrapyramidal symptoms to be "medically determinable

impairments" at Step Two and "severe" at Step Three of the evaluation or, in the alternative, the ALJ

failed to adequately explain his findings.  Again, the Court disagrees.

Pursuant to 20 C.F.R. § 404.1520(a)(4)(ii), at the second step of the sequential evaluation

process, an ALJ is required to determine whether a medically determinable impairment may be

classified as severe and whether such impairment meets the duration requirement of 42 U.S.C. §

423(d)(1)(A), which provides:

(1) The term "disability" means--

(A) inability to engage in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to result in death

---

[6]"Oculogyric crisis" is "a dystonic reaction to certain drugs or medical conditions characterized by a prolonged involuntary upward deviation of the eyes."  Oculogyric Crisis, Wikipedia (available at http://en.wikipedia.org/wiki/oculogyric_crisis) (last accessed October 28, 2015).

or which has lasted or can be expected to last for a continuous period of not less than 12 months.

"A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms." 20 C.F.R. § 404.1508. Section 404.1508 provides that a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." More specifically, "symptoms" are the claimant's description of his/her own physical or mental impairments; "signs" are anatomical, physiological, or psychological abnormalities that can be observed apart from symptom descriptions and must be shown by medically acceptable clinical diagnostic techniques; and "laboratory findings" are anatomical, physiological or psychological phenomena that can be shown by use of medically acceptable laboratory diagnostic techniques. 20 C.F.R. § 404.1528.

An ALJ's omission of an impairment altogether could be reversible error. "It is beyond dispute that an ALJ is required to consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less. ... Further, the failure to consider all of the impairments is reversible error." *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (citations omitted); *see also Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (emphasis in original).

Here, the Plaintiff contends the ALJ not only failed to classify the identified impairments as

"severe," but also failed to consider them at all.  Accordingly, the first question here is whether the omitted impairments are "medically determinable."  *See Salazar*, 468 F.3d at 621 (finding borderline personality disorder was a medically determinable impairment that the ALJ should have identified and assessed at Step Two); *see also Elliott v. Astrue*, 507 F. Supp. 2d 1188, 1194 (D. Kan. 2007) ("Therefore, the first consideration at step two is what, if any, medically determinable impairments plaintiff has regardless of the credibility of her allegations of the severity of those impairments."). The Court finds the ALJ was correct in not identifying specifically "dystonia," "torticollis," "sialorrhea," and "oculogyric crisis" during Step Two; there is no medical evidence in the record establishing these as "medically determinable impairments" pursuant to the applicable regulations. While, of course, the providers who treated Plaintiff for her mental health problems noted physical issues the Plaintiff reported at her sessions, and suggested that such issues might constitute "dystonia," "torticollis," "sialorrhea" and/or "oculogyric crisis," these were not findings "shown by medically acceptable clinical and laboratory diagnostic techniques" and, thus, Plaintiff has failed to show they are each medically determinable impairments pursuant to the regulations.  [*See, e.g.,* AR 265-266, 268 ("patient describes symptoms of torticollis"; report of neck movement "is likely torticollis"; "symptoms described are consistent with dystonia"; provider notes a desire to "confirm dystonia dx")]  In fact, one of the providers notes that the Plaintiff's lack of insurance in June 2012 was "limiting us this year in terms of work up for her dystonia," suggesting that this condition can be shown by objective medical tests.  [AR 273]

To the extent Plaintiff argues she was unable to produce medical evidence of the identified conditions due to lack of insurance, the first time these physical conditions appear in the record is

on the date of disability onset, February 7, 2012, when Plaintiff reported her involuntary neck tilting had been "on and off for 3 years" (AR 266); thus, while she asserts she had no insurance in 2012 to seek medical treatment, the record demonstrates she was working in 2009 and she does not indicate she had no insurance then.

Nevertheless, although "dystonia," "torticollis," "sialorrhea" and/or "oculogyric crisis" each may not be medically determinable impairments demonstrated by the record before the Court, the records do indicate a diagnosis of "extrapyramidal symptoms" (EPS) that was consistent from February 7, 2012 through March 8, 2013. [*See* AR 267, 290]  As demonstrated by the Wikipedia definitions set forth above, it is likely EPS includes Plaintiff's symptoms of "dystonia," "torticollis," and/or "oculogyric crisis."  In any event, the medical records undoubtedly indicate the diagnosis and treatment (by medication) of EPS for more than one year during the disability period; the Court finds EPS is a medically determinable impairment.

The ALJ did not mention EPS in Step Two of his evaluation. [AR 20-21] However, "an error at step two of the sequential evaluation concerning one impairment is usually harmless when the ALJ, as occurred here, finds another impairment is severe and proceeds to the remaining steps of the evaluation. . . . This is because *all* medically determinable impairments, severe or not, must be taken into account at those later steps."  *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010) (citing *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)).  Thus, the question is whether the ALJ took into account Plaintiff's EPS at later steps of the evaluation.  The Plaintiff's third issue challenges this question and the Court will proceed to analyze that issue.

Accordingly, the Court finds no error by the ALJ at Step Two of his evaluation.

III.    **ALJ's Duty to Fashion the RFC**

A residual functional capacity ("RFC") assessment is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work related physical or mental activities."  SSR 96-8p, 1996 WL 374184 at *2.  It is assessed "based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements.'"  *Id.*  "[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."  *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

Plaintiff argues the ALJ failed to consider her physical impairments when formulating the RFC.  The Court has already determined that EPS is a medically determinable physical impairment that likely includes dystonia, torticollis and/or oculogyric crisis.  Thus, the Court must analyze whether the ALJ properly considered EPS for the RFC.  *See Wells*, 727 F.3d at 1068 ("In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not.") (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)) (emphasis in original).

Concerning Plaintiff's physical impairments, the ALJ found:

The undersigned highlights that the record is absent of ongoing complaints of shakes and dizziness which does not enhance her credibility and there is no statement by any treating physician as of her alleged onset date indicat[ing] that she is unable to work. In fact on that date she was noted to be actively seeking employment and was doing well (Ex. 2F/l 9-20).
. . .

In regards to her physical condition, notes indicate that in 2010 neurology had worked her up for diplopia but as of her alleged date of onset she had not returned for any follow up care despite having had insurance at that time. She reported having her "eye go up" and occasional stiffness when reaching for items (Ex. 2F/17). Examination revealed mild rigidity but no cogwheeling.

She was not seen again for another 3 months, in May of 2012 (Ex. 2F/21). This relatively infrequent and conservative care certainly does not support her allegations. The claimant had failed to increase her medication as had been recommended at her prior visits. She was able to split up her Geodon. She continued to complain of some mild to moderate symptoms of dystonia including head tilt and her eye going up which causes diplopia. The doctor did not recommend any other changes to her medication regime or needed medical intervention (Ex. 2F/22).

By November of 2012, with changes in her medication, she reported that her muscle spasms had decreased; yet she did not feel she could work due to her muscle spasms. She was no longer having any falling or problems with her legs, and she made no mention of dizziness, all of which [was] inconsistent with her testimony. Her primary problems involved eyes rolling into her head or neck feeling stiff (Ex. 3F/l -2).

In January of 2013 it was noted that the claimant had sporadic problems with her legs cramping, she also had 1 to 2 minutes of oculo gyr[ic] daily. She has torticollis which is partially a result of diplopia and needed to tilt her head to the side to alleviate diplopia (Ex. 3F/4). It appeared that the claimant was not taking her medication as prescribed as she had not filled her medication since October of 2012, which may have contributed to her symptoms (Ex. 3F/5). Her host family was instructed to help assure that she was compliant with her medication. Physical examination showed that she was well-developed and well-nourished in no distress. She was neurologically intact with normal strength, no tremors, no cranial nerve deficit or sensory deficit; she had normal muscle tone (Ex. 3F/6).

Later records indicated that there were no changes with the dystonia in her neck. She continued to have diplopia and had some unsteady gait but no tremors and was neurologically intact (Ex. 3F/13).

The undersigned has taken into consideration these symptoms and provided the necessary limitations within the residual functional capacity to accommodate these side effects. The record lacks anything more than conservative care of adjusting her medications to try and accommodate or alleviate these side effects, there is no evidence of these symptoms greatly affecting her activities of daily living nor has she

had any required emergency treatment for anything related to these symptoms. While she did have some worsening of the double vision in her right eye the undersigned has limited her to seeing only out of one eye as a job requirement and there are jobs which she can perform that would allow her to make such changes.

[AR 22, 24] Based on this analysis by the ALJ, the Court finds unpersuasive Plaintiff's argument that the ALJ failed to "discuss the limiting effects of non-severe impairments in combination with other impairments as part of his [RFC] analysis at step four." Clearly, the ALJ considered the reported "dystonia," "torticollis," and "oculogyric crisis" during Step Four of his analysis. Further, Plaintiff's complaint here that the ALJ "improperly" restricted Plaintiff to monocular vision is belated, particularly considering that the ALJ provided such restriction to the vocational expert during the hearing and Plaintiff's counsel did not object. [AR 61-62] Moreover, Plaintiff's contention that the ALJ misunderstood the relationship, if any, between a dystonia and diplopia is inconsequential; the Plaintiff fails to show that such misunderstanding resulted in an improper RFC finding or restriction. Finally, Plaintiff's disagreement with the ALJ about whether the record supported stricter restrictions for Plaintiff's EPS is insufficient to demonstrate any error by the ALJ. *See Miller v. Astrue*, 496 F. App'x 853, 859-60 (10th Cir. 2012) (ALJ did not err when he did not include limitations for an impairment he found to be severe at step two when that limitation was not "borne out by the evidentiary record.").

The Court notes that the ALJ did in fact "provide necessary limitations within the [RFC] to accommodate [Plaintiff's] side effects" [AR 24], including limitations on lifting and carrying; climbing scaffolds, ladders, or ropes; balancing; and working at unguarded heights or near unguarded hazardous equipment. [AR 21] In addition, Plaintiff is "not required to see out of more

than one eye." [*Id.*]

Accordingly, the Court finds the ALJ did not err in formulating the RFC in this case.

## IV.   ALJ's Credibility Findings

Plaintiff argues that the ALJ's statements concerning her credibility are "illogical, based on irrelevant factors, and not supported by substantial evidence."

Once objective medical evidence shows that a claimant has an impairment that can reasonably be expected to produce symptoms, the ALJ is required to consider the claimant's assertions of the symptoms and decide whether to believe them. *Thompson v. Sullivan*, 987 F.2d 1482, 1489 (10th Cir. 1993). "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990); *see also Cowan*, 552 F.3d at 1190 (10th Cir. 2008).  However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted).

Here, the ALJ determined "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." [AR 22] The Plaintiff challenges the ALJ's conclusions concerning Plaintiff's receipt of unemployment benefits and citations to regulations concerning periods of unemployment.  The Court finds these challenges unpersuasive as it is not clear the ALJ was making "credibility" determinations through such conclusions. [See AR 22]

Second, the ALJ's finding concerning Plaintiff's "belief" that she was "capable of some work activity" was made in the context of the period before and at the beginning of Plaintiff's disability onset date; the Court does not construe this finding as demonstrating the ALJ's belief that Plaintiff continued to look for work and, thus, continued to believe she was capable of work after mid-2012.

Finally, Plaintiff challenges the ALJ's finding concerning the time between her last job and her date of disability.  Plaintiff claims that it is "illogical" for the ALJ to find a lack of credibility based on the Plaintiff's admission that she stopped working in 2011 due to reasons other than her health issues.  The Court agrees that the ALJ's finding is, at a minimum, vague as to how Plaintiff's admission concerning her ability to work in 2011 belies her contention that she was unable to work starting in 2012 due to "severe and disabling symptoms."  Nevertheless, the Court finds that any error as to Plaintiff's credibility is harmless, since the ALJ thoroughly reviewed the objective medical evidence (particularly that dated on and after the disability onset date), as well as the type and effectiveness of the treatment Plaintiff received, acknowledged and considered Plaintiff's EPS symptoms, included restrictions to account for such symptoms in his RFC, and concluded (without mentioning any credibility issues), "In sum, the above residual functional capacity assessment is supported by the minimal findings within the record of evidence, her significant activities of daily living, and the persuasive opinion of the State Agency psychological expert." [*See* AR23-25]

It appears that any error made by the ALJ finding Plaintiff lacked credibility because she admitted she could work in 2011 did not have a substantial effect on his assessment of her credibility concerning her conditions after 2012.  *See, e.g., Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1168-69 (10th Cir. 2012). The Court perceives no reversible error by the ALJ regarding his credibility

23

findings.

## **CONCLUSION**

In sum, the Court finds the ALJ committed no reversible errors in developing the record,

analyzing the severity of Plaintiff's impairments, fashioning the RFC, and determining the Plaintiff's

credibility.  Therefore, the decision of the ALJ that Plaintiff Belma Jazvin was not disabled is

**affirmed**.

Dated at Denver, Colorado this 30th day of October, 2015.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

24